

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 17, 2024**

**United States Bankruptcy Judge**

___

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| RICKIE ALLEN CLAYBROOK and BETTY JO CLAYBROOK, | § § § § | Case No. 23-50030-rlj7 |
| Debtor. | § § § | |
| LUBBOCK AUTO AUCTION, LTD., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Adversary No. 23-05001 |
| RICKIE ALLEN CLAYBROOK, | § § § | |
| Defendant. | § § | |

## MEMORANDUM OPINION

Plaintiff, Lubbock Auto Auction, Ltd., brings its action against Rickie Allen Claybrook seeking a determination of non-dischargeability of a portion of its debt under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6). Adv. No. 23-05001, ECF No. 1.

1

I.

Rickie Allen Claybrook and Betty Jo Claybrook filed a joint chapter 7 bankruptcy petition on February 28, 2024. Case No. 23-50030, ECF No. 1. The case is a no-asset case—the Chapter 7 Trustee filed a report of no distribution on April 27, 2023.

Betty Jo Claybrook formed and owns DMC Remarketing, Inc. (DMC). DMC is in the business of auto re-sales. DMC held a "wholesale" license permitting it to buy vehicles and then sell them to other automobile dealers, as opposed to the general public. Despite owning DMC, Betty Jo Claybrook did not participate in DMC's day-to-day operations in a meaningful way, i.e., she did not buy and sell vehicles. Rickie Allen Claybrook handled the vast majority of operations—critical to this action, he was the party who dealt with Lubbock Auto Auction.

Lubbock Auto Auction is a family-owned business that operates an automobile auction that is only open to licensed and approved automobile dealers. Lubbock Auto Auction offers a "float program" where it finances vehicle purchases for dealers. The program generally works like this: Lubbock Auto Auction advances the purchase price of a vehicle being purchased by a dealer at the auction, and the purchaser-dealer then has 28 days to repay the advanced amount plus a fee for the "float" and possibly other miscellaneous charges (such as for restoration, if need be).

The "agreement" at the heart of the issue here stems from the float program, which was tailored to DMC's unique circumstances. Confoundingly, the agreement between Lubbock Auto Auction and DMC was an oral agreement. For a typical arrangement, Lubbock Auto Auction would provide information on its float program and require that float-program participants complete forms that it provides for the program. *See generally* Pl. Exs. 1, 4, 5, 6, & 7.

The agreement was negotiated and agreed to between Charles Furr, the president of Lubbock Auto Auction, and Rickie Claybrook, as representative of DMC. Shandyl Higgins, Furr's daughter and a part owner of Lubbock Auto Auction, handles the bookkeeping and business operations of Lubbock Auto Auction; she managed the implementation of the agreement reached between Charles Furr and Rickie Claybrook. Despite Shandyl Higgins's involvement, she was not privy to the negotiations.

All parties acknowledge that the dealings were, and the agreement is, between Lubbock Auto Auction and DMC and *not* between the individuals.

The basic agreement was that Lubbock Auto Auction would advance funds to DMC for its purchase of vehicles at the auction—though the loan funds bypassed DMC and passed directly to the dealer-seller of the vehicle. Notations on the back of the vehicle titles would reflect that the title was re-assigned to DMC as a dealer, but Lubbock Auto Auction would maintain physical possession of the title. When DMC resold the vehicle, Rickie Claybrook would request and receive the title from Lubbock Auto Auction. Rickie Claybrook would then provide the title to the purchaser, and the purchaser would pay DMC for the vehicle. Occasionally, Lubbock Auto Auction would send the title directly to the purchaser, but in such situations, DMC would still be the party receiving the sales proceeds. After receiving the funds from the purchaser, DMC was to remit the funds it owed to Lubbock Auto Auction in a timely manner.

The float arrangement began in 2019. The specifics of the agreement changed over time, with the changes generally benefitting DMC. For example, the fees were reduced after Rickie Claybrook wrote to Charles Furr, requesting a reduction in fees. Pl. Ex. 9. That writing is the written documentation that references the agreement between Lubbock Auto Auction and DMC.

Throughout their arrangement, DMC incurred a substantial amount of debt with Lubbock Auto Auction, surpassing $500,000 and at one point ranging from $700,000 to $800,000. The Claybrooks' bankruptcy schedules reflect a debt owed to Lubbock Auto Auction in the amount of $590,000. Case No. 23-50030, ECF No. 1 at 26. The schedules state that the debt arises from a "Floor Line of [c]redit" to DMC. *Id*. The parties have agreed that the debt has been reduced to $295,000, which was the result of Lubbock Auto Auction liquidating DMC's inventory.

The Debtors list the "DBA DMC Remarketing Inc" in question 2 of their petition, which directs Debtors to identify the other names used by the Debtor in the last 8 years, and explicitly states: "Do NOT list the name of any separate legal entity such as a corporation…that is not filing this petition." Case No. 23-50030, ECF No. 1 at 1. It is not contested that DMC is a separate entity from Rickie and Betty Claybrook.

The allegations here focus on six vehicles that Rickie Claybrook purchased and later sold pursuant to the float agreement between Lubbock Auto Auction and DMC.[1] Rickie Claybrook notified Lubbock Auto Auction the vehicles were sold during late October and November of 2022. Lubbock Auto Auction contends that it never received payment for the vehicles and thus the debt owed for those vehicles is non-dischargeable under § 523(a)(2)(A) as a debt obtained by false pretenses or fraud, under § 523(a)(4) for fraud while acting as a fiduciary, and under § 523(a)(6) as a debt resulting from a willful and malicious injury by the debtor.[2]

## II.

The Court has jurisdiction of this case and this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and the Northern District of Texas's Order of Reference of Bankruptcy Cases and

---

[1] Those specific vehicles are a 2012 Chevy Camaro, a 2013 Ram 2500, a 2017 Honda CRV, a 2021 Dodge Charger, a 2017 Jeep Grand Cherokee, and a 2014 Chevrolet Silverado. Plaintiff Ex. 8.

[2] "Section" or "§" refers to the Bankruptcy Code, 11 U.S.C., unless otherwise indicated.

4

Proceedings Nunc Pro Tunc, Misc. Order 33. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

"The exceptions [to discharge] are construed strictly against the creditor and liberally in favor of the debtor." *Laughlin v. Nouveau Body & Tan, L.L.C. (In re Laughlin)*, 602 F.3d 417, 421 (5th Cir. 2010) (alterations in original) (quoting *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009)). "The same construction principles favoring a debtor are imposed in an action to determine the dischargeability of a particular debt." *Simmons v Bohanna (In re Bohanna)*, No. 18-40847, 2019 WL 7580173, at *9 (Bankr. E.D. Tex. Nov. 15, 2019). The standard of proof for objecting to dischargeability of a particular debt is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287–88 (1991).

**A.**

As a threshold matter, the Court concludes that Lubbock Auto Auction's action under § 523(a) fails because the debt sought to be discharged is owed by DMC and *not* Rickie Claybrook.

Section 523 of the Bankruptcy Code addresses whether certain "debts" of *the debtor* should be held to be non-dischargeable. Such debts include those of the type that are alleged here—debts arising from a false representation or actual fraud (§ 523(a)(2)(A)), debts from fraud committed by debtor while acting in a fiduciary capacity (§ 523(a)(4)), and debts resulting from a willful and malicious injury caused *by the debtor* (§ 523(a)(6)). A "debt" in a bankruptcy case "means liability on a claim." 11 U.S.C. § 101(12). A claim generally means a "right to payment." 11 U.S.C. § 101(5). A "creditor" may file a proof of claim in the debtor's bankruptcy case. 11 U.S.C. § 501. A creditor is an entity, including a person, that has a claim *against the debtor*. See 11 U.S.C. § 101(10), (15).

5

Lubbock Auto Auction's actions are entirely premised upon its reliance on representations and promises made by Rickie Claybrook as an alleged fiduciary that arose from a special relationship between Lubbock Auto Auction and Claybrook. Lubbock Auto Auction does not explicitly state, nor did it prove, that Claybrook is personally liable for the $109,925 that it asks to be declared non-dischargeable. And Lubbock Auto Auction does not dispute that such amount is part of the total debt owed to it by DMC.

The evidence establishes that DMC, which is owned by Debtor Betty Jo Claybrook, bought and sold vehicles as a licensed dealer. DMC and Lubbock Auto Auction had an oral agreement for Lubbock Auto Auction's flooring of DMC's purchase of vehicles at Lubbock Auto Auction's auctions. DMC defaulted on the arrangement and thus is indebted to Lubbock Auto Auction in an amount of about $295,000. The $109,925 at issue here is part of the $295,000. But the Debtors, the Claybrooks, are *not* the parties obligated for the $295,000. DMC is not the debtor here; and if it were, it would not be discharged from this debt. *See* 11 U.S.C. § 727(a)(1) (a debtor that is *not* an individual cannot be granted a discharge in chapter 7).

Lubbock Auto Auction asserts that Rickie Claybrook owes the debt as fiduciary because there was a substantial amount of trust placed in him by Lubbock Auto Auction. Lubbock Auto Auction provides caselaw supporting its argument that a fiduciary duty may "arise from a moral, social, domestic or purely personal relationship of trust and confidence." *In re Estate of Poe*, 648 S.W.3d 277, 287 (Tex. 2022) (internal quotation and citation omitted). But Lubbock Auto Auction does not dispute that Claybrook's dealings with Lubbock Auto Auction (and its representative Charles Furr) were on behalf of DMC. Even were the Court to find that Claybrook's dealings were such as to instill a justifiable reliance by Mr. Furr on Claybrook's promises, Lubbock Auto Auction wholly fails to explain why such promises and reliance are not

6

between Lubbock Auto Auction and DMC. It was DMC that incurred the obligation; the Court cannot hold Rickie Claybrook liable for the debt here. DMC is not in bankruptcy; as postured and argued, the dischargeability of DMC's debt has no bearing on the Debtors.

**B.**

The Texas Business Organizations Code provides for exceptions to the limited liability of a corporation's obligations—the relevant exception being when the corporation is used for fraud. Tex. Bus. Org. Code § 21.223(b).[3] But Lubbock Auto Auction does not rely on this provision, and there are issues with the applicability of the provision—for example, whether Rickie Claybrook was an owner of DMC such that Texas Business Organizations Code § 21.223 applies. The evidence is that Betty Claybrook is the sole owner of DMC. With no argument on the issue, the Court does not consider the applicability of § 21.223.

---

[3] In full, § 21.223 provides:
> Sec. 21.223. LIMITATION OF LIABILITY FOR OBLIGATIONS. (a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:
> (1) the shares, other than the obligation to pay to the corporation the full amount of consideration, fixed in compliance with Sections 21.157–21.162, for which the shares were or are to be issued;
> (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory; or
> (3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including the failure to:
> (A) comply with this code or the certificate of formation or bylaws of the corporation; or
> (B) observe any requirement prescribed by this code or the certificate of formation or bylaws of the corporation for acts to be taken by the corporation or its directors or shareholders.
> (b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

Tex. Bus. Org. Code § 21.223.

### III.

Though the foregoing discussion resolves this action in Claybrook's favor, the Court will address the specific causes under § 523 alleged here by Lubbock Auto Auction.

### A.

### § 523(a)(2)(A)

Section 523(a)(2)(A) states that a discharge under § 727 does not discharge individuals from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by…false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

For false pretenses and representations, the Fifth Circuit poses the test as requiring that "the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance." *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005). For the third element, the scienter requirement, the debts are those "obtained by frauds involving 'moral turpitude or intentional wrong, and any misrepresentations must be knowingly and fraudulently made.'" *Id.* (quoting *In re Martin*, 963 F.2d 809, 813 (5th Cir. 1992)).

The actual fraud prong of § 523(a)(2)(A) does not require a false *representation*. *See generally Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 359 (2016) ("The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."). The Texas common law elements of fraud applied by the Fifth Circuit in the actual fraud analysis of § 523(a)(2(A) are "(1) that a material

8

representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 391 (5th Cir. 2018) (quoting *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)). On its face, the Fifth Circuit analysis does *not* comport with the Supreme Court's holding that actual fraud does not require a representation. Regardless, the Court does not need to resolve these discrepancies because the elements of false representations and actual fraud under § 523(a)(2)(A) require intent.

The principal facts alleged that give rise to the § 523(a)(2)(A) claim are that Rickie Claybrook made false representations and committed actual fraud when he obtained the titles to the six vehicles that DMC did not pay for. Pre-Trial Order at 2–3 [Adv. No. 23-05001, ECF No. 34]. The evidence does not establish that Rickie Claybrook intended to take the titles and not repay Lubbock Auto Auction for the vehicles. Lubbock Auto Auction did not satisfy its burden in proving its § 523(a)(2)(A) charge. The facts of the case do not support the inference that Rickie Claybrook acted with the requisite intent.

### B.

### § 523(a)(4)

Lubbock Auto Auction's second cause of action, under § 523(a)(4), requires it prove the Debtor committed fraud while acting in a fiduciary capacity, embezzlement, or larceny. As mentioned above, Lubbock Auto Auction provides caselaw that supports its position that a fiduciary relationship may exist when one party places great trust and confidence in another. And Lubbock Auto Auction provided ample evidence that it trusted Rickie Claybrook—it had an

9

extensive history with Rickie Claybrook and respected him as a car salesman. The issue with this cause is that § 523(a)(4) applies to debt for fraud, embezzlement, or larceny committed by a debtor that is an individual. Here, the debt in question is *DMC's* debt for the titles of six vehicles in the amount of $109,925. Simply put, the debt that Lubbock Auto Auction seeks to exempt from discharge is not the proper debt to support its § 523(a)(4) charge. DMC is not in bankruptcy and seeks no discharge of its debt.

## C.

## § 523(a)(6)

Lubbock Auto Auction's final cause of action asks that the Court except the $109,925 debt under § 523(a)(6). Section 523(a)(6) provides that a discharge under § 727 "does not discharge an individual debtor from any debt…for willful and malicious injury by the debtor to another entity[.]" The United States Supreme Court "examined the language of Section 523(a)(6) and concluded the provision applies to 'acts done with the actual intent to cause injury,' but excludes intentional acts that cause injury." *Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 508 (5th Cir. 2003) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)). "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*[.]" *Kawaauhau*, 523 U.S. at 61 (emphasis in original).

Shortly after *Kawaauhau*, the Fifth Circuit clarified the circuit's § 523(a)(6) test.[4] *See Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598 (5th Cir. 1998). In the Fifth Circuit, "[t]he

---

[4] Prior to *Kawaauhau*, the Fifth Circuit test for § 523(a)(6) was:
> Accordingly, today we reaffirm our place in the circuit majority identified in *In re Walker* by holding that, for willfulness and malice to prevent discharge under § 523(a)(6), the debtor must have intended the actual injury that resulted. As indicated in *Quezada* and *Walker*, intent to injure may be established by a showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury.

*Corley v. Delaney (In re Delaney)*, 97 F.3d 800, 802 (5th Cir. 1996) (emphasis added) (referencing *Hope v. Walker (In re Walker)*, 48 F.3d 1161 (11th Cir. 1995) and *In re Quezada*, 718 F.2d 121 (5th Cir. 1983)).

10

test for willful and malicious injury under Section 523(a)(6)…is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor."[5] *In re Williams*, 337 F.3d at 509 (quoting *In re Miller*, 156 F.3d at 606). The evidence at trial suggests the injury—the loss of $109,925—was unintended when the titles to the six vehicles were taken. And then moving to November 7, 2022, in Rickie Claybrook's telling, he attempted to set up a plan moving forward to repay for the vehicles when it was clear DMC did not have the funds. Lubbock Auto Auction disputes this point. This is not to say that Lubbock Auto Auction did not suffer an injury that DMC caused, only that with the evidence provided, the Court cannot adduce that Rickie Claybrook intended to cause the injury.

## IV.

Section 523 concerns debts of *the debtor*. The parties here have stipulated that the only debt at issue is DMC's obligation. DMC does not benefit from the Claybrooks' discharge. The debt underlying the six vehicles, $109,925, is owed to Lubbock Auto Auction by DMC, and not Rickie Claybrook.

Lubbock Auto Auction's objections to dischargeability will be denied.

### End of Memorandum Opinion ###

---

[5] Some courts have treated what the Fifth Circuit purports to be a "single inquiry" as a "two-part test" where the court determines if the plaintiffs have proven "either (1) an objective substantial certainty of harm; or (2) a subjective motive to cause harm." *Mikel v. Mikel (In re Mikel)*, No. 21-3071, 2022 WL 17418872, at *8–9 (Bankr. N.D. Tex. Dec. 5, 2022) (internal quotations omitted). In applying either test, the relevant questions are the same.